No. 2942.

## JIM COLEMAN v. THE STATE.

BURGLARY WITH INTENT TO RAPE—FACT CASE.—To support a conviction for burglary it devolves upon the State to prove beyond a reasonable doubt not only the burglarious entry of the house, but the specific criminal intent alleged in the indictment. See the statement of the case for evidence *held* insufficient to support a conviction for burglary with intent to rape, because, even if sufficient to show the entry into the house, it is wholly insufficient to establish that specific intent.

APPEAL from the District Court of Smith. Tried below before the Hon. F. J. McCord.

The conviction in this case was for the burglary of the house of A. J. Hill, with intent to commit rape upon Miss Maggie Hill. The penalty assessed by the verdict was a term of three years in the penitentiary.

Miss Maggie Hill was the first witness for the State. She testified that she was the female mentioned in the indictment, and was the daughter of A. J. Hill, the person of that name alleged to be the owner of the house burglarized on the night of March 18, 1888. The witness lived at the house of her father, and on the night of the said March 18 she occupied the room in the said house which adjoined the sleeping room of her father and mother. The bed in that room, occupied by the witness and her brother, who was but ten years of age, was the only bed in the said room. About ten o'clock on the said night, the witness was awakened from her sleep by the pressure of a hand on her breast. She sprang from her bed at once and ran into the adjoining room occupied by her father and mother, got a match, returned to her own room, struck the match, and then saw the defendant in her said room. He was then standing at the window, in the act of raising it. The witness at once called to her father that there was a man in her room, and then ordered the defendant to leave. He did so by raising the window sash, jumping out, and letting the window sash fall behind him. The witness's parents came into her room after she called, but did not reach it until after the defendant had escaped. The witness knew and recognized the defendant as the man who came into her room on the said night. He lived about a mile distant from witness's father's said house, and about two years before this trial was in the employ of witness's father and lived at the latter's house. The witness occupied the same room two years ago, when defendant worked on her father's place, that she occupied on the night of the attempted outrage. Nothing of special value, such as money or jewelry, had ever been kept in that room. The witness, on the morning after her room was entered by the defendant, observed that a tub was upturned just beneath her window on the outside of the house, and that the chine of the said tub was filled with water. She did not consent for the defendant to enter her room.

Cross examined, the witness said that her room was west of and adjoining the sleeping room of her father and mother. The two said rooms were separated by a partition wall. The

door in that partition wall leading from one room to the other
was open when the witness retired on that night, but was
closed when she was awakened and found the defendant in the
room she occupied. That door was the only one leading into
the witness's said room. Witness's bed stood just by the door,
and very close to the partition wall. The bed occupied by the
witness's parents in the adjoining room was on the opposite side
of the said room from the door which led into the witness's
room. The witness occupied that side of her bed which was
nearest the door. The night of the attempted outrage was a
wet and dark one, rain having fallen during the day and the
early part of the night. There was no light in the witness's
room until she struck the match. The witness saw the defend-
ant as soon as she struck the match, but only saw his back, and
he was then getting out of the window. His face was com-
pletely hidden from the witness's view. He had on no coat.
As soon as the witness's parents got into her room she told her
father that the person who had just left her room was Jim Cole-
man, this defendant. The sash of the window through which
the defendant escaped was down when the witness retired on
that night, and it was down when she lighted the match, and
the defendant had to raise it when he jumped out. He let it
fall behind him as he went out. The pressure of a hand on her
breast was what awakened the witness, and she knew at once
that some person was in her room. She sprang out of bed at
once, ran into her father's room, secured a match, returned to
her own room instantly, struck the match and saw and recog-
nized the defendant as he jumped out of the window, and then
she returned to a table in her father's room, and with the same
match lighted the lamp that was then on the table. By the
statement that defendant put his hand on her breast the wit-
ness meant that he put his hand in her bosom.

A. J. Hill, the father of the prosecutrix, testified, for the State,
that he and his wife occupied the room in his house adjoining that
of his daughter Maggie. About ten o'clock, on the night of March
18, 1888, he was awakened by being called by his said daughter;
and about the time he got awake he heard his daughter exclaim:
"Get out of here, you rascal!" Witness then asked his daugh-
ter what was the matter. She replied that there was a man in
her room. Witness then asked her who it was, and she replied
that it was Jim Coleman, this defendant. Just then the witness
heard a noise like the falling of a window sash. He then got

up and went into his daughter's room, but saw no man. The door between the rooms of witness and his daughter Maggie was closed on that night when Maggie went to bed. The witness's said house was a frame building, which set north and south, and contained four rooms. The room on the south end, which was occupied on that night by James Davis and his brother—nephews of the witness—was separated by a hall from the other three rooms on the north end of the house. The middle room on the north end was the room occupied by the witness and his wife. A door connected that room with a hall on the south. Another door led into the dining room on the east, and another door into Maggie's room on the west. Maggie's said room had not been erected when the defendant lived with the witness, about two years before this trial.

Witness examined the ground outside of his house on the morning after the alleged attempted outrage. He found an inverted tub on the outside of the house immediately beneath Maggie's window, the chine of which was filled with water. Around and about the said tub he found bare foot tracks, and found the same tracks at and about the well shelter, from which point the witness and others traced it to a point in a wheat field about four hundred yards distant from the house, and on the side of the field opposite from the house. After crossing the field fence the witness found a shoe track, but could not find the place where a person had stopped to put on shoes. He followed that shoe track toward and within seventy yards of the house of Henry Coleman, the father of defendant, at which house the defendant lived. The ground from the last mentioned point to the said house was hard, and no impression of the shoe track could be found nearer the house. The witness first saw the barefoot tracks underneath his daughter's window and at the well house, on the night of and just after the attempted outrage, using a torch as a light. He traced that barefoot track about seventy-five yards in the direction of the wheat field, but could follow it no further that night. Early on the next morning the witness sent to a neighboring tie camp where some convicts were at work and got some bloodhounds, which were put on the trail, but they failed to follow it. Witness and his party then followed the trail of the shoe track to a point within seventy yards of Henry Coleman's house, and then they went to the said house and asked Henry Coleman for the defendant's shoes. Henry Coleman produced a pair of shoes

which were wet, and which showed to have been recently worn in the rain and mud. But, when applied to the shoe tracks described, they were found not to fit nor correspond. The defendant was then taken to the wheat field and his bare feet applied to the bare foot tracks, and by actual measurement his bare feet were found to correspond with and fit those tracks. Witness did not consent to the entry of his house on the said night by the defendant or anybody else. The windows of the house were all down, and the doors all closed but not locked, when witness retired on that night.

James Davis testified, for the State, that, on the night of March 18, 1888, he slept at the house of A. J. Hill, in the room on the south end of said house. The witness was awakened from his sleep about ten o'clock on that night by Maggie Hill calling to her father that there was a man in her room. Within a moment or two witness heard the fall of a window sash. The witness, Mr. Hill and Mrs. Hill went into Maggie's room, reaching it together just after the falling of the window sash. Mrs. Hill at once asked Maggie who that was that had just left the room. Maggie replied that she did not know, but soon afterwards said that it was Jim Coleman, the defendant. A short while afterwards the witness made a torch, and he and Mr. Hill proceeded to make an examination of the premises. They found an inverted tub and bare foot tracks on the ground outside of the house, and just beneath Maggie's window. They found those tracks again at the well house, and trailed them thence to a point, in the direction of the wheat field, about seventy-five yards distant. On the next morning some blood hounds were placed on the trail, but they failed to take or follow it. Hill, witness and others then took the bare foot track, and trailed it to the wheat field fence, on the side opposite from Hill's house, and about four hundred yards distant. At this point they lost the bare foot track, but beyond the fence they found a shoe track, which they followed to the hard ground within seventy yards of the house of Henry Coleman, the father of defendant. Henry Coleman was then asked to produce the shoes of defendant. He produced a pair of shoes which, however, did not fit the tracks spoken of. The defendant, who was found at his father's house grinding an axe, was then taken to the wheat field, where his bare feet were applied to the bare foot tracks, and found to fit and correspond perfectly with them.

The State closed.

Elijah Campbell was the first witness for the defense. He testified that he was with Hill, Davis and others on the morning of March 19, 1888, when they took the defendant from Henry Coleman's house to Hill's wheat field and by measurement compared defendant's bare feet to a bare foot track in the field. The said track was at least an inch longer than the defendant's foot. Witness was standing within two feet of the parties when they placed the defendant's feet in the track, and he distinctly saw that the track was at least an inch the longest.

Henry Coleman, the father of the defendant, testified, in his behalf, that he and his wife and five children, including the defendant, occupied a house of a single room, about a mile dissant from the house of Mr. A. J. Hill. Defendant left the witness's house on the evening of March 17, 1888, to go about seven miles to visit some relatives. He went on foot. He got back home on the next night (which was the night of the alleged attempted outrage), while the witness and his family were eating supper. It was then a little after dark. It had rained during the day, and was raining when the defendant got home. He was wet, and at once pulled off his clothes, put on a dry shirt, and, having only the one pair of drawers he was wearing, he hung them across a chair to dry. Without leaving the house again, he went to bed with three other of the children, and did not leave his bed until early the next morning, when witness put him to cutting timber. There was but one room in the house, and but one door to the room. The witness slept close to that door. The said door was fastened with a chain, and could not possibly have been opened without the knowledge of the witness. In short, the witness absolutely knew that the defendant was not outside of the said house after he entered it at supper time, until the next morning.

Defendant cut but little timber on the next morning until he complained that his axe was dull, and he was grinding it at the house when Messrs. Hill, Davis, Campbell and others arrived. Hill, as soon as he reached the witness's house, asked to be shown the defendant's shoes, and the witness handed him the shoes—the identical shoes that defendant wore away from home two days before, and back home on the previous day. The parties soon returned the shoes to witness, remarking that

---

---

they did not fit the tracks. The parties then took the defendant to Mr. Hill's wheat field and applied his bare feet to the barefoot track that was in that field. Witness was standing near, and saw the measurement of the foot to the track. The heel of the foot was not placed at the extreme of the heel of the track, and the track showed to be, at the very least, a full half inch longer than the foot. The defendant, at the time of this trial, was in the seventeenth year of his age.

Dennis Coleman, the brother of the defendant, testified, in his behalf substantially as did Henry Coleman, in support of the alibi relied upon.

The motion for new trial raised the question discussed in the opinion.

*White & Edwaras*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. We do not hesitate to say that, as presented to us in the record, the evidence is insufficient to sustain the conviction. It devolved upon the prosecution to prove satisfactorily, beyond a reasonable doubt, not only that the defendant entered the house, but that he entered it with the specific intent to commit the felony of rape, as charged in the indictment. We do not say that the evidence is insufficient to warrant the conclusion that the defendant did enter the house. We must say, however, that we would hesitate to declare that it excludes all reasonable doubt that he was the person who entered the house. While the witness Maggie Hill testified positively that she recognized him, it is evident from her own statements that she may have mistaken another person for the defendant, and the circumstances tending to identify him as the person who entered the house are weak and inconclusive.

But if we concede that it was sufficiently proved that the defendant entered the house, the evidence falls far short of proving with any degree of certainty that he entered with the specific intent of committing rape. We might as well conclude from the evidence that his intent was to commit murder or theft as that it was to commit rape. In fact, we think it more reasonable, from the evidence, to conclude that his intent was to commit theft than to commit any other crime, and particularly the crime of rape. In the same house in which Maggie

Hill was sleeping were five other persons. Her father and mother were in a room adjoining hers; two men were in another room, and her brother, ten years of age, was in the bed with her. It is scarcely probable that a sane person, knowing the situation, would undertake to commit a rape upon Maggie Hill by force, and there is no pretense that a rape by means of threats or fraud was intended.

When he was discovered by Maggie Hill in her room, and she accosted him, he made no attempt to use force upon her, but fled from the room instantly. The fact that he placed his hand on her bosom while she was asleep does not necessarily show that his intention was to ravish her. It was a dark night, dark in the room, and he may have touched her person accidentally while groping about the room in quest of something to steal. For aught that appears in the evidence before us, he may have been in the room with no intent to commit a felony or theft, but with other intent unnecessary to mention. We are wholly uninformed by the record as to facts which might repel the supposition that he may have entered the house with any other intent than to commit felony or theft. We must look alone to the facts disclosed in the record in determining the sufficiency of the evidence to support the conviction, and from the facts thus shown we must say that the evidence does not prove that defendant entered the house with the intent to commit the crime of rape, and no other intent can suffice to sustain the conviction. (Hamilton v. The State, 11 Texas Ct. App., 116; Turner v. The State, 24 Texas Ct. App., 12.)

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered October 27, 1888.